## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LORENA PINO,

      Plaintiff,

      v.                            Case No. 21-2398-JAR-KGG

MEDICALODGES, INC.,

      Defendant.

## MEMORANDUM AND ORDER

Plaintiff Lorena Pino brings this action alleging discrimination and retaliation on the basis of race under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 against her former employer, Defendant Medicalodges, Inc.  Before the Court are Defendant Medicalodges, Inc.'s Motion for Summary Judgment (Doc. 45) and Motion to Strike Plaintiff['s] Declaration in Support of her Memorandum in Opposition to Defendant's Motion for Summary Judgment Against Plaintiff (Doc. 54).  The motions are fully briefed, and the Court is prepared to rule.  As described more fully below, the Court denies both motions.

## I.      Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a

---

[1] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

reasonable jury could return a verdict for the non-moving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[7]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[8]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript[,] or a specific exhibit incorporated therein."[10]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[11]

---

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4] *Wright ex rel. Trust Co. of Kan. v. Abbott Lab'ies, Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

[7] *Anderson*, 477 U.S. at 256.

[8] *Id.*

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[10] *Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000).

[11] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[12]

## II.   Uncontroverted Facts

The following facts are uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff as the nonmoving party.

Plaintiff Lorena Pino is a former employee of Defendant Medicalodges, Inc., located in Holton, Kansas.  Defendant provides skilled nursing, rehabilitation, assisted living, and in-home care services.  Plaintiff, a Hispanic female, was employed by Defendant as a Certified Nursing Assistant ("CNA") and Restorative Aide from October 17, 2019 until February 9, 2021.  Plaintiff's first language is Spanish.  During Plaintiff's employment, Marsha Ricketts was Defendant's facility administrator and Linda Root-Covel was the Director of Nursing ("DON").  CNAs reported directly to Root-Covel; Root-Covel reported directly to Ricketts.

### *Policies*

Defendant is federally required to comply with the Nursing Home Reform Act and the Elder Justice Act for allegations of abuse and neglect toward its residents.  Defendant is legally required to follow regulations issued by the Centers for Medicare and Medicaid Services on abuse and neglect.

Defendant maintains a written Personnel Policies document that became effective January 25, 2019.  The first paragraph of this document provides: "An employee charged with a criminal offense may be suspended without pay pending a full criminal investigation.  Following such investigation, the employee may be reinstated at the discretion of Medicalodges, without

---

[12] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

pay during the suspension."[13]  Although Defendant generally does not allow for suspensions without pay for more than ten days, there is an exception where an employee is charged with a criminal offense.  If Defendant decides to wait for the criminal process to conclude, the suspension without pay could last longer than ten days.  It is possible for the employee to be brought back to work depending on the outcome of the charges.

Among Defendant's many Personnel Policies are the following policies and procedures: (1) Reporting and Investigating Alleged Abuse of Residents/Clients; (2) Equal Employment Opportunity Practices and Procedures; and (3) Policy Prohibiting Discrimination, Harassment, and Retaliation, which includes procedures for reporting complaints about violations of these policies.  On October 15, 2019, Plaintiff signed an Acknowledgement of Personnel Policies at the end of this document, acknowledging that she read and understood it.

Defendant also has a separate Abuse, Neglect, and Exploitation Policy that is modeled after the federal guidelines and states:

> The resident has the right to be free from verbal, sexual, physical and mental abuse and involuntary seclusion.  It is the policy of Medicalodges, Inc., to treat each resident with respect, kindness, dignity and care, to keep them free from abuse and neglect and to take swift and immediate action to investigate and adjudicate alleged resident abuse and neglect.[14]

"Abuse" is defined by the policy as "the willful infliction of injury; the unreasonable confinement, neglect, intimidation or punishment with resulting physical harm, pain or mental anguish or deprivation by an individual (including a caretaker) of goods or services necessary to attain or maintain physical, mental and psychosocial well-being."[15]  "Verbal abuse" is defined as

---

[13] Doc. 49-1 at 2.

[14] Doc. 46-9 at 1.

[15] *Id.*

> any use of oral, written or gestured language that willfully includes disparaging and derogatory terms to residents or their families or within their hearing distance regardless of their age, ability to comprehend or disability.  Examples of verbal abuse include, but are not limited to, threats of harm or saying things to frighten a resident (such as telling them they will never see their family again).[16]

"Neglect" means

> failure to provide the goods and services necessary to avoid physical harm, mental anguish or mental illness. Neglect occurs on an individual basis when a resident receives lack of care in one or more areas, e.g., absence of frequent monitoring of a resident known to be incontinent resulting in the resident being left to lie in urine or feces.[17]

Using profanity in front of the residents is a violation of the Abuse, Neglect, and Exploitation policy.

Defendant and its employees are legally required to report all allegations of abuse and neglect to the Kansas Department for Aging and Disability Services ("KDADS") and the Police. The Abuse, Neglect, and Exploitation Policy also provides that "**ALL** reasonable suspicions of a crime under section 1150B of the Social Security Act . . . shall be reported as required."[18] Additionally, "[a]ll unexplained bruising, skin tears, reluctance of a resident to accept care from certain staff members and abrupt changes in behavior as well as any pattern of injury shall be reported to appropriate staff."[19]

The Abuse, Neglect, and Exploitation Policy provides that "[t]he Administrator and Director of Nursing are responsible for the investigation of alleged violations and reporting the

---

[16] *Id.*

[17] *Id.*

[18] *Id.* at 5.

[19] *Id.* at 4.

results of the investigation to the proper authorities.  All reported and/or suspected incidents of abuse, neglect or exploitation of personal property shall result in an investigation."[20]  Any time such a report is made against an employee, that person "should be immediately sent home and suspended without pay by the person in charge until a thorough investigation can be conducted by the DON/Administrator."[21]

The Abuse, Neglect, and Exploitation policy provides a signature block under an Employee Acknowledgement Form that states in part, "I understand that violations of this policy may result in disciplinary action, up to and including termination."[22]

Prior to her employment with Defendant, and as part of her CNA education at Highland County Community College, Plaintiff learned about patient abuse and neglect.  Specifically, Plaintiff learned that it "shouldn't happen at all,"[23] and that she had a duty to protect patients from harm, abuse, and neglect.  Plaintiff completed Defendant's Abuse, Neglect, and Exploitation training on October 15, 2019 and October 27, 2020.

### *Plaintiff's Complaints of Discrimination*

In November 2020, Plaintiff began having issues with two of her coworkers—Haley Bickford and Toni Johanson—who worked in the kitchen at the time.  They made fun of her accent, mocked her, made fun of immigrants, and told her it was their "First Amendment Right" to do so.[24]

---

[20] *Id.*

[21] *Id.* at 5.

[22] *Id.* at 6.

[23] Doc. 46-3 at 47:6.

[24] *Id.* at 59:10.

On December 16, 2020, Bickford reported to management that Plaintiff had used profanity at work.  Plaintiff was suspended pending an investigation.  After investigating, Root-Covel and Ricketts determined that Plaintiff did not use profanity and cleared her to return to work.

On December 25, 2020, Plaintiff submitted a written complaint to management about Bickford and Johanson, stating that they made fun of her, mocked her, mocked immigrants, and insisted they had a First Amendment right to do so.  She stated that she filed a formal complaint with the Equal Employment Opportunity Commission and that she is "past the point of reporting these racist bullies to supervisors or the DON since they refuse to fix this humiliating and retaliating situation."[25]  Root-Covel received Plaintiff's complaint and then shared it with Ricketts, seeking her guidance about "what direction I should go in."[26]  Ricketts does not recall seeing the complaint prior to preparing for her deposition in this case.

Plaintiff also provided a copy of her complaint to Defendant's corporate office, which was forwarded to the Regional Vice President for an investigation.  As part of that investigation, Defendant interviewed various staff members and Ricketts prepared a summary statement.

On December 28, 2020, Plaintiff complained to Defendant's General Counsel, Pam Smith, that two kitchen employees made derogatory comments about immigrants.

***Plaintiff's Treatment of Resident Thomas Mapes on February 4, 2021***

Elderly individuals are at risk for developing skin tears, which may be caused by accident.   On February 4, 2021, one of Defendant's residents, Thomas Mapes, received a skin

---

[25] Doc. 49-5 at 2.

[26] Doc. 49-4 at 153:16–24.

tear when Plaintiff was helping him get dressed for the day.  Courtney Perkins, a new CNA who

was training with Plaintiff that day, witnessed the incident and provided a handwritten statement:

> I was in helping Lorena Pino, CNA help get Tom [Mapes] up for
> breakfast[.]  While we were changing tom his pickline [sic] came
> untapped [sic] he told Lorena and she kept try [sic] to put his shirt
> on anyways.  Tom then became irritated raised his voice to get her
> attention and said it came undone.  Lorena did not explain to tom
> what she was about to do before doing it.  She rushed and was very
> rough. Once tom was in his chair we noticed his arm was bleeding.
> Lorena went and got the nurse.  Tom stated himself he was
> irritated with Lorena.  While Lorena was rolling tom she did not
> tell him before hand [sic].  Tom did not appreciate being yanked
> and pulled on.  I'm on my 4th day of training.[27]

The skin tear was two centimeters long.

Charge Nurse Yi Bergsten was Plaintiff's supervising charge nurse on February 4, 2021.

Per protocol, Bergsten was notified of the skin tear and completed a risk management form.  The

only narrative section of the form is the "Incident Description," which includes a "Nursing

Description" and "Resident Description."  The nursing description states: "at about 8am, 2 CNA

get resident up.  The cap of Picc line rubbed on his right forearm during transferring with hoyer

lift, 2cm skin tear noted to right forearm."[28]  The resident description states: "I got skin tear."[29]

The form lists "0" as Mapes' numerical level of pain.

### *Defendant's Investigation*

Defendant promptly suspended Plaintiff and began an investigation, which included

interviewing Perkins and Mapes, and taking a statement from Plaintiff.  Root-Covel understood

that when conducting an abuse investigation, she was required to obtain witness statements from

all employees who were working at the time of the incident.

---

[27] Doc. 49-16 at 1.

[28] Doc. 49-9 at 1.

[29] *Id.*

Root-Covel completed a KDADS complaint in accordance with the Abuse, Neglect, and Exploitation Policy.  She stated in the report that on February 4, 2021, at 8:30 a.m., Perkins reported to her that Plaintiff was "rough" with a resident while getting him dressed, not telling him the steps she was taking before she did them, and causing a skin tear near his PICC site.  According to this report, Root-Covel spoke to the resident, who reported to her that "this is not the first time she has been rough with him."[30]  In the Conclusion section of the KDADS report, Root-Covel stated: "Based on the statements from and interviews with Thomas Mapes, Courtney Perkins, Lorena Pino and the Holton Police Department, we find this substantiated abuse."[31]  Plaintiff provided a handwritten statement that she had not touched the "iv thing he has on his arm," but noticed blood when she transferred him to his wheelchair, at which point she immediately asked Perkins to find a nurse.[32]  There is no record of a witness statement from Bergsten, separate from the risk management report she completed on the day of the incident.

Root-Covel interviewed Mapes with Amy Spiker, Social Services Designee, on February 4, 2021.  According to the KDADS report that Defendant submitted on February 8, 2021, Mapes told them that Plaintiff

> was "rough" with him and was "yanking" him around.  He reports this is not the first time she has been rough with him.  He became irritated and raised his voice to get her attention but she continued.  The tape on the PICC line came loose and PICC cap caused the skin tear. . . .  On 2/5, Officer Misti Davis spoke with Thomas and he told her the same as above.[33]

---

[30] Doc. 46-10 at 3.

[31] *Id.*

[32] *Id.* at 36.

[33] *Id.* at 3.

The report indicates that Mapes had a "BIMS" score of 15.[34]  Spiker interviewed five other residents with a BIMS score of 15.  All of those residents answered "no" when asked if they had been handled roughly and answered "yes" when asked if they felt safe.  Defendant's investigation included a medical assessment of Mapes, which confirmed he had a skin tear.

### *Criminal Investigation*

On February 4, 2021, Defendant contacted the Holton Police Department ("Holton PD") about a possible elder abuse case.  On February 5, 2021, Holton Police Officer Misty Davis was dispatched to Defendant's facility to investigate.  She interviewed Root-Covel, Spiker, Ricketts, Perkins, Mapes, and took a photograph of the skin tear.   Officer Davis recorded her visit, including her interview with Mapes, on her "bodycam," which was saved as part of the police file.  The audio of that file was then transcribed by a court reporter.  The Court has reviewed the video, filed conventionally by Plaintiff in opposition to summary judgment.[35]

Before the Mapes interview, Root-Covel told Officer Davis that Mapes is "cantankerous and a complainer.  But this was witnessed."[36]  Root-Covel told Officer Davis that Plaintiff was previously suspended for using profanity.  Ricketts told Officer Davis that

> there was two aids in the room (indiscernible) and one CNA who we suspended immediately, um, was not telling Mr. Mapes what they were doing.  And they were just undressing him and dressing him.  And with that, they caused a skin tear right underneath the PICC line because they were being rough.[37]

---

[34] *Id.* at 8.  BIMS stands for Brief Interview for Mental Status.  It is a screening tool to help determine cognition.  *See, e.g.*, https://www.verywellhealth.com/bims-identifying-dementia-98637#:~:text=BIMS%20stands%20for%20Brief%20Interview,nursing%20homes%20to%20assess%20cognition.  Someone who is not cognitive has a BIMS score of 99.

[35] Doc. 52 (conventionally-filed Ex. 6B).

[36] Doc. 49-6 at 4:12–13.

[37] *Id.* at 9:12–18.

Officer Davis asked for Plaintiff's contact information in order to interview her.  She told Ricketts, Root-Covel and Spiker: "Okay.  Alright.  Well, if we're gonna be chargin' her, I'm gonna have to have her date of birth."[38]  Officer Davis stated that she would need to interview Mapes and Plaintiff, and that she would have Plaintiff come to the police department in order to get her side of the story.  She repeated that she had to "have all sides of the story."[39]  Then, Officer Davis stated: "Yep.  That's what it says, Whiting, and let her know that she's gonna be getting charged with battery because you can't—can't manhandle (indiscernible) how old is he?"[40]

According to Officer Davis's report, Mapes reported that he could not recall what happened, but "that the one nurse was very rough with him."[41]  Ricketts told Officer Davis that Mapes refers to Plaintiff not by her name, but as "nurse"; he refers to all CNAs as "nurse."  The Court has reviewed video-recording of this interview.  Mapes did not mention Plaintiff by name during the interview, and Root-Covel asked most of the questions, reminding him what happened the day before.  Mapes could not remember all that had happened the day before when Perkins and Plaintiff were caring for him, and stated that "they were rushin[g]," which he said was normal.[42]

According to Officer Davis's February 5, 2021 Incident Report, Plaintiff told her that Mapes' PICC line came untapped when she was getting him dressed and that she advised him she would take care of it after she was finished dressing and moving him.  After she and Perkins

---

[38] *Id.* at 15:14–16.

[39] *Id.* at 21:5.

[40] *Id.* at 21:7–10.

[41] Doc. 49-17 at 1.

[42] Doc. 49-6 at 24:11–12.

moved him to a chair, they noticed he was bleeding and sent for a nurse to help.  Officer Davis concludes: "During Lorena's interview, her story was very inconsistent with what was reported by Linda and Courtney.  After the interview was over, I thank[ed] her for her time and told her that I was going to give my report to the County Attorney's office."[43]

Defendant decided to terminate Plaintiff on February 9, 2021.  Ricketts informed Plaintiff that she was being discharged "for misconduct connected with their work. . . .  Specifically, such items causing this discharge are as follows: Failure to meet Medicalodges standards, as evidenced by any type of abuse or neglect to residents."[44]

Ricketts made the decision to terminate Plaintiff, and testified that others, including Root-Covel, had input in the decision.  Root-Covel does not recall whether she discussed termination with Ricketts and believed Ricketts made the ultimate recommendation.  Defendant's interrogatory states that Root-Covel, Ricketts, and Jana Daniels from Human Resources provided input into the decision to terminate Plaintiff.  Ricketts testified at her deposition that she and Root-Covel reviewed all of the witness statements and substantiated the abuse allegations against Plaintiff based on information provided by Mapes because he was "alert and oriented" when he described to them what happened.[45]  Ricketts further testified that she believed they had the police report in hand, including witness statements, when they made the decision to terminate.  Ricketts sent an email to Defendant's legal department on February 9, 2021, stating that she and Root-Covel terminated Plaintiff "on an allegation of abuse [that] was found to be substantiated."[46]

---

[43] Doc. 49-17 at 2.

[44] Doc. 46-2 at 1.

[45] Doc. 49-8 at 58:19–22.

[46] Doc. 49-23.

On March 18, 2021, a criminal complaint was filed in the District Court of Jackson County, Kansas against Plaintiff, alleging one count of Battery, a Class B Person Misdemeanor, in violation of K.S.A. § 21-5413(a)(1) on the basis of Plaintiff's conduct with Mapes.  Plaintiff appeared on the charge and a bench trial was set and continued several times.

On November 8, 2021, the charge was amended to Disorderly Conduct, a Class C Misdemeanor, in violation of K.S.A. § 21-6203(a)(3).  On February 14, 2022, Plaintiff accepted a Diversion Agreement offered by the Jackson County Attorney on the Disorderly Conduct charge.  She carefully read the agreement, understood it, signed, initialed, and acknowledged the agreement.  The Diversion Agreement includes a Stipulation of Facts:

> The Defendant stipulates that [s]he is the individual charged herein, and that the events which led to the charges pending against the Defendant occurred within Jackson County, Kansas. Defendant further stipulates to the facts as they are contained in the complaint, and any police reports, written witness statements, test results prepared and taken in connection with this case and waives foundation testimony for introduction of the same.  The Defendant understands and agrees that if there is a violation of any of the terms and conditions of the Diversion Agreement, the case will proceed to trial based solely on the facts stipulated herein.[47]

### *Comparators*

Defendant has terminated five white employees for resident abuse and/or neglect since 2016.  In 2020, Defendant terminated CNA Brooke Hase after a report that she loudly told a resident to "sit your butt down" in the dining room.  Root-Covel completed the KDADS report for this incident; Ricketts was the Administrator.  During Hase's interview, she confessed to making this statement.

---

[47] Doc. 46-13 at 3.

In 2020, Defendant ultimately terminated RN Eric Marshall after a suspension pending investigation by Defendant and the Holton Police Department.  A resident reported that Marshall told him he could not use his call light and was "growly" about it.[48]  Root-Covel completed the KDADS report for this incident; Ricketts was the Administrator.

In 2018, Defendant ultimately terminated CNA Lexi Moore after investigating a report of resident neglect.  The resident in Moore's case alleged that she failed to answer her call light and did not solicit help from other staff.  Administrator Blair Wagner completed the KDADS report for this incident; Eva Ebner was DON at the time.

In 2017, Defendant ultimately terminated CNA Richard Garson after investigating a report that he yelled at and mocked a resident.  Administrator Wagner completed the KDADS report.

In 2016, Defendant ultimately terminated Nurse Sheryl Stremmel after investigating a report of resident abuse.  The report, which Defendant determined was substantiated, alleged that Stremmel held a resident's mouth shut so that the resident could not run away or spit medication out.  Administrator Wagner completed the KDADS report for this incident; Ebner was DON at the time.

Defendant has declined to terminate four white employees after allegations of abuse were found to be unsubstantiated.  In February 2020, a resident accused two white CNAs of abuse—Shaina Corn Olberding and Sylvia Wilson.  According to the resident, they declined to help her get to the restroom, telling her that she had to walk, and then came back later to help her get into her chair.  The CNAs were suspended pending an investigation.  They both maintained that they

---

[48] The Court overrules and denies Plaintiff's objection to this statement of fact under Rule 56(c).  The Court finds that the KDADS report supports the facts surrounding Marshall's termination.  Doc. 46-29 at 1–6.

did help the resident to the bathroom and then into her chair.  Root-Covel, Spiker, and Ricketts investigated; they obtained written statements from the resident and the CNAs.  KDADS was notified but law enforcement was not.

In October 2020, a resident alleged that G.L., a white CNA and maintenance and transport worker, sexually abused him over a six-month period of time.  According to the resident, G.L. had been reporting to his room in the middle of the night and touching him inappropriately.  G.L. was suspended pending an investigation.  Root-Covel investigated and concluded that G.L. had been visiting the resident's room at night in plainclothes in order to change the resident's incontinence products; G.L. wore plainclothes due to his day job as a maintenance and transport worker.  As part of her investigation, Root-Covel obtained a notarized witness statement from G.L. and from the nurse on duty at the time of the incident.  Defendant reported the allegation to the police, and Officer Davis investigated.  She interviewed the resident and concluded that the allegation of sexual abuse was unfounded.  Defendant required G.L. to begin wearing scrubs at night so the residents could better recognize him as a CNA, did not allow G.L. to attend that resident going forward, and Defendant agreed to conduct follow-up visits with the resident to ensure he felt safe.

In December 2020, LPN Christina Shockey admitted to using profanity in the presence of residents but was not terminated.  She was suspended without pay but ultimately allowed to return to work.

## III.  Discussion

Defendant moves for summary judgment on the merits of all claims alleged in the Pretrial Order—discrimination and retaliation on the basis of race under both Title VII and 42 U.S.C.

§ 1981.  These claims must be decided under the familiar *McDonnell Douglas Corp. v. Green*[49]

burden-shifting framework because Plaintiff relies on circumstantial evidence.[50]  Under

*McDonnell Douglas*, plaintiff initially bears the burden of production to establish a prima facie

case of discrimination or retaliation.[51]  The burden of establishing the prima facie case is "not

onerous."[52]  If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate

a facially non-discriminatory reason for its actions.[53]  If defendant articulates a legitimate non-

discriminatory reason, the burden shifts back to plaintiff to present evidence from which a jury

might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief."[54]

### A.    Discrimination Claims

#### 1.    Prima Facie Case

Plaintiff may establish a prima facie case of race discrimination under Title VII  or

§ 1981 by demonstrating (1) membership in protected class; (2) an adverse employment action;

and (3) the adverse employment action occurred under circumstances giving rise to an inference

of discrimination.[55]  It is undisputed that Plaintiff belongs to a protected class and that she

suffered an adverse employment action when she was terminated.

---

[49] 411 U.S. 792, 802–05 (1973).

[50] *See, e.g.*, *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011).

[51] *McDonnell Douglas*, 411 U.S. at 802.

[52] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

[53] *Id.*; *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

[54] *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

[55] *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 & n.5 (10th Cir. 2007) (discussing how elements of prima facie case in discrimination cases vary depending on context); *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 n.1 (10th Cir. 2015) (acknowledging that the Tenth Circuit has used different versions of the prima facie test, but stating that it has "express[ed] a preference for more concise formulations." (citations omitted)).

Defendant disputes that there is evidence to support the third prong of the prima facie case.  Plaintiff responds that evidence of preferential treatment shown to her white coworkers raises an inference of discrimination.  "An inference of discrimination can arise from an employer's favoritism toward a similarly situated employee who is not part of the protected class.  Employees are similarly situated when they share a supervisor or decision-maker, must follow the same standards, and engage in comparable conduct."[56]

Plaintiff points to the following comparators: G.L., Shockey, Corn, and Wilson.  All four employees were CNAs and shared the same supervisors—Root-Covel and Ricketts—and were required to follow Defendant's Abuse, Neglect, and Exploitation Policy.  The parties dispute whether these employees engaged in comparable conduct and whether they were subject to the same investigatory and disciplinary standards as Plaintiff.  When considering whether similarly situated employees engaged in comparable conduct, "the comparison need not be based on identical violations of identical work rules; the violations need only be of comparable seriousness."[57]

Here, there is no dispute that G.L.'s alleged conduct violated a rule of comparable seriousness—he was accused of sexually abusing a resident.  Root-Covel admitted during her deposition that these allegations were in fact more serious than the complaint against Plaintiff.  Defendant argues that, unlike Plaintiff, G.L.'s conduct was unsubstantiated after an investigation that included a law enforcement referral.  While this is true, a reasonable jury could conclude that G.L. was given preferential treatment during the course of the investigation as compared with Plaintiff.  Viewing the evidence in the light most favorable to Plaintiff, the allegations

---

[56] *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021) (first citing *PVNF, L.L.C.*, 487 F.3d at 800–01; and then citing *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 540 (10th Cir. 2014)).

[57] *Smothers*, 740 F.3d at 541 (quoting *Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir. 1995)).

against both G.L. and Plaintiff were substantiated based on whether those involved in the investigation believed the residents' statements.  In the case of G.L., Officer Davis explained that she, Spiker, and Root-Covel decided that the resident was confused about seeing a plainclothes employee checking on his incontinence products in the middle of the night, but it is unclear what about the resident's statement caused them to all agree that the allegation of abuse was unfounded.  Root-Covel testified during her deposition that G.L.'s behavior was inappropriate and that he would not be allowed to attend to that resident anymore.  Nonetheless, Defendant decided not to terminate him.  A reasonable jury could conclude that this was preferential treatment, particularly given Root-Covel's statement that Mapes was "cantankerous" and Plaintiff's evidence that Mapes did not identify her by name or fully recollect what had happened without prompting by Ricketts or Root-Covel.

Plaintiff also points to Defendant's failure to terminate Shockey, who admitted to using profanity in front of a resident, which is a violation of the Abuse, Neglect, and Exploitation Policy.  While it may be true that this conduct falls short of the physical abuse for which Plaintiff was accused, it is considered a violation of the same policy.  Ricketts and Root-Covel investigated and decided not to terminate Shockey, despite her admitting the violation.  A reasonable jury could conclude that this was preferential treatment, particularly when viewed in conjunction with Plaintiff's evidence that Root-Covel told Officer Davis that Plaintiff had previously used profanity in front of the residents.  In Plaintiff's case, Root-Covel's statement was not only false, but a reasonable jury could conclude that it was made with the intent to influence the criminal investigation into her conduct with Mapes.

Finally, Plaintiff points to Defendant's treatment of Corn and Wilson.  Like Plaintiff, they were suspended pending an investigation into a violation of the Abuse, Neglect, and Exploitation

Policy, but the investigators decided that the resident's allegations were unsubstantiated. They also declined to report this to law enforcement. As with G.L., a reasonable jury could conclude that this was preferential treatment.

Defendant's evidence that it has terminated several white employees over the last five years for violations of the Abuse, Neglect, and Exploitation Policy does not negate Plaintiff's prima facie showing. Three of the employees referenced by Defendant—Moore, Garson, and Stremmel—are not similarly situated because they had different supervisors and were not subject to the 2019 Abuse, Neglect, and Exploitation Policy. Moreover, their terminations occurred in 2016 through 2018, several years before the facts giving rise to this case. The other two employees do not suffice to negate the inference of discrimination Plaintiff proffers to support this element of her prima facie case. Hase had the same supervisor and was terminated for comparable conduct, but unlike Plaintiff she admitted to the complaint. Marshall was not a CNA. He was a nurse and the information in the summary judgment record contains no details about the investigation that prefaced Defendant's decision to terminate him.

Plaintiff has submitted sufficient evidence to demonstrate a genuine issue of material fact about whether Defendant's treatment of similarly situated white employees raises an inference of discrimination under Title VII and § 1981.

### 2. Defendant's Legitimate, Non-Discriminatory Reason for Termination

Defendant contends that Plaintiff was terminated for a substantiated allegation of abuse of a resident on February 4, 2021, after it conducted an investigation into her conduct. Defendant has therefore met its minimal burden of articulating a legitimate, non-discriminatory reason for Plaintiff's termination.

### 3.     Pretext

The burden shifts back to Plaintiff to show that Defendant's proffered reason for its termination decision is a pretext for discrimination.  Pretext may be shown by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[58]  Pretext can also be demonstrated by "direct evidence that the proffered rationale is false, or that the plaintiff was treated differently from similarly-situated employees."[59]  "The critical question regarding this aspect of the *McDonnell Douglas* rubric is whether 'a reasonable factfinder could rationally find [the employer's rationale] unworthy of credence and hence infer that the employer did not act for the asserted [non-discriminatory] reasons.'"[60]  The Court examines "the facts as they appear *to the person making the decision*"[61] and considers whether the decisionmaker "honestly believed those reasons and acted in good faith upon those beliefs."[62]

Plaintiff relies on the following arguments in support of her claim that Defendant's explanation for her termination was a pretext for race discrimination: (1) certain evidence

---

[58] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

[59] *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011) (citing *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007)).

[60] *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015) (alterations in original) (quoting *Crowe*, 649 F.3d at 1196).

[61] *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007) (en banc) (quoting *Watts v. City of Norman*, 270 F.3d 1288, 1295 (10th Cir. 2001)).

[62] *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (quoting *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 924–25 (10th Cir.2004)).

suggests that Root-Covel did not honestly believe that Plaintiff abused Mapes; (2) Defendant failed to conduct a fair investigation into Plaintiff's treatment of Mapes; (3) there were procedural irregularities when investigating the abuse claim; (4) Root-Covel unduly influenced the criminal investigation and misrepresented Mapes' report in the KDADS report; and (5) Defendant treated Plaintiff differently than similarly situated white employees.

Defendant almost exclusively relies on the stipulation of facts in Plaintiff's Diversion Agreement as evidence that it did not discriminate. Defendant urges that this evidence establishes that Plaintiff was rough when handling Mapes, that she never explained to him what she was doing, that she pulled and yanked him, that she did not take her time when changing him, that she ignored him when he told her that the PICC line was caught on his shirt, that she continued to change his shirt despite him becoming irritated and raising his voice, and that her treatment resulted in Mapes' PICC line tearing his skin where it was taped to his forearm. Defendant repeatedly argues that the stipulation of facts in the Diversion Agreement is an admission that she was terminated for a non-discriminatory reason. Defendant also relies on Plaintiff's deposition testimony, claiming she agreed that the decisionmakers would have determined that there was abuse and neglect based on the information before them at the time of the termination decision. Defendant does not otherwise reply to Plaintiff's assertions of pretext evidence other than to dispute that similarly situated white employees were treated more favorably than Plaintiff.

The Court first addresses Defendant's assertion that the Diversion Agreement and Plaintiff's deposition testimony prohibit Plaintiff from controverting the underlying facts surrounding her termination before considering Plaintiff's assertions of pretext.

### a.    Motion to Strike and the Diversion Agreement

### i.    Diversion Agreement

Defendant maintains that because the Diversion Agreement signed by Plaintiff contains a stipulation of facts regarding the underlying charge, Plaintiff cannot assert in response to summary judgment that she did not abuse Mapes.  Defendant further argues that the Diversion Agreement constitutes a stipulation that Defendant in fact terminated Plaintiff for abuse, rather than for a discriminatory purpose.  Indeed, Defendant moves to strike Plaintiff's Declaration under the "sham affidavit" doctrine.  Plaintiff responds that the doctrine does not apply here because the Diversion Agreement is not prior testimony.

A "sham affidavit" is "when a witness submits an affidavit that contradicts the witness's prior testimony."[63]  If the Court determines the rule applies, it may disregard the affidavit.[64]  In determining whether an affidavit creates a sham issue, the Tenth Circuit directs district courts to consider whether "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain."[65]  The Tenth Circuit "explicitly require[s] that a district court first 'determine whether the conflicting affidavit is simply an attempt to create a "sham fact issue" before excluding it from summary judgment consideration.'"[66]  "Although 'sham affidavit' opinions typically address conflicts between such an affidavit and prior deposition

---

[63] *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1219 n.3 (10th Cir. 2014) (citing *Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009)).

[64] *Id.*

[65] *Law Co.*, 577 F.3d at 1169 (quoting *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001)).

[66] *Id*. (quoting *Durtsche v. Am. Colloid Co.*, 958 F.2d 1007, 1010 n.2 (10th Cir. 1992) (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

testimony, the rationale is that the affiant had every reason to disclose the information earlier, so the last-minute affidavit should at least explain the failure."[67]  Therefore, the rule has been applied before where the prior statement is signed under penalty of perjury such as in a plea agreement, prior affidavit, or declaration signed under penalty of perjury.[68]

Although Defendant's motion seeks to strike the entire declaration, the only statement in the declaration at issue is ¶ 4: "On February 4, 2021, while caring for resident Thomas Mapes, I was not rough with Mr. Mapes.  I did not abuse Mr. Mapes."[69]  Defendant first argues that this statement conflicts with the stipulation of facts in Plaintiff's Diversion Agreement, which she signed on February 14, 2022, more than one year after her termination.[70]  As a matter of Kansas law, Plaintiff did not plead guilty to the crime of Disorderly Conduct; a diversion is instead "a means to avoid a judgment of criminal guilt."[71]  The stipulation contained within that agreement is to "the facts as they are contained in the complaint, and any police reports, written witness statements, test results prepared and taken in connection with this case and waives foundation testimony for introduction of the same."[72]  Because such facts include the reports concluding that Mapes' abuse was substantiated, Defendant contends that Plaintiff may not now deny that she was rough with, or that she abused Mapes in her declaration.

The Court denies the motion to strike to the extent it's based on the Diversion Agreement.  The stipulation of facts in the Diversion Agreement is not a prior sworn statement.

---

[67] *Genberg v. Porter*, 882 F.3d 1249, 1263 (10th Cir. 2018) (Hartz, J., concurring in part and dissenting in part).

[68] *In re Chavez*, 614 B.R. 874, 884–85 (Bankr. D.N.M. 2020) (collecting cases).

[69] Doc. 49-2 ¶ 4.

[70] Doc. 46-13 at 3.

[71] *Kansas v. Chamberlain*, 120 P.3d 319, 323 (Kan. 2005).

[72] Doc. 46-13 at 3.

Plaintiff was not subject to cross-examination and there is no indication that she was given all of the documents referred to in the stipulation of facts when she signed it.  There is also no indication that she signed the Diversion Agreement under penalty of perjury.  Defendant does not cite, nor can the Court locate, a case from the Tenth Circuit or the District of Kansas that applies the sham affidavit rule in this context.  Moreover, Plaintiff's declaration is not inconsistent with the statements *she* provided during the investigation.

The Court also finds that the probative value of the Diversion Agreement with respect to Plaintiff's pretext showing is far less than Defendant submits in its briefing.  The Diversion Agreement was signed on February 14, 2022, more than one year after Plaintiff's termination.  Thus, it could not have formed the basis for Defendant's decision to terminate.  Moreover, there are no specific facts identified in the stipulation of facts that would estop Plaintiff from arguing that the investigation into abuse was motivated by discriminatory or retaliatory intent in this case.[73]  Finally, the Diversion Agreement is not an admission of guilt; it is an agreement between Plaintiff and the State that, if fulfilled, will result in the State dismissing the charge against her.[74]  It does not bar Plaintiff in this civil action from arguing that the investigation into abuse and subsequent termination were motivated by unlawful discrimination or retaliation.

---

[73] To be clear, Defendant does not attempt to argue that judicial estoppel applies.  Instead, it baldly asserts that "Plaintiff cannot have her cake and eat it too.  Plaintiff cannot agree to committing a crime and the underlying facts to obtain Diversion, then turnaround [sic] and disagree with the facts when there is monetary gain at stake."  Doc. 46 at 23.  Of course, by definition, Plaintiff did not "agree to committing a crime" by entering into this Diversion Agreement.  She did not plead guilty.  And, any stipulation of facts that she entered into is a matter of contract between herself and the State, entered into over a year after her termination.  *See Chamberlain*, 120 P.3d at 323.  .

[74] *Id.* (citing K.S.A. §§ 22-2911(b), 12-4416(a)).

#### ii.      Deposition Testimony

Defendant also argues that Plaintiff's declaration is inconsistent with her prior deposition testimony because she responded "yes" to the following question:

> If you were making a decision about whether there was abuse and neglect by a resident, and you said you loved the residents, and I appreciate that, but let's put you in the position of making a decision, and you saw that a patient had a skin tear as the result of a pulled PICC line and you had information that the CNA that was working with that patient had been rough with the patient while dressing him.  Would you consider that to be abuse and neglect?[75]

The Court denies the motion to strike to the extent it is based on this prior testimony.  First, the Court does not find that the declaration directly contradicts this testimony.  Plaintiff's declaration states that she did not abuse and was not rough with Mapes.  Her deposition testimony, in contrast, responds to a question about how the decisionmakers viewed the facts when making the termination decision.  She did not admit in this testimony that she was rough with Mapes, or that she abused him.  Therefore, the sham affidavit rule does not apply.  Second, the context of this deposition testimony reflects that Plaintiff was confused by counsel's question.  Even if there was a direct conflict between the testimony and Plaintiff's affidavit, she would be permitted to address that confusion in the affidavit.  Defendant's motion to strike based on Plaintiff's deposition testimony is denied.[76]

---

[75] Doc. 46-3 at 118:3–17.

[76] The Court declines to consider the additional deposition testimony identified by Defendant for the first time in the reply brief.  Doc. 62 at 3–4.  This testimony was neither cited to nor referenced in the original motion, so Plaintiff was not on notice of her need to respond to it at the time she filed the response.  Generally, a party waives arguments raised for the first time in reply.  *See, e.g.*, *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011) (citing *M.D. Mark, Inc. v. Kerr–McGee Corp.*, 565 F.3d 753, 768 n. 7 (10th Cir. 2009)).

### b.      Plaintiff's Pretext Evidence

### i.      Similarly Situated Employees

As noted, the only pretext argument that Defendant addresses is Plaintiff's claim that similarly situated white employees were treated more favorably despite comparable violations of Defendant's Abuse, Neglect, and Exploitation Policy.  Like the inference of discrimination element of the prima facie case, pretext may be shown by evidence that Plaintiff "was treated differently from other similarly-situated employees who violated work rules of comparable seriousness."[77]

When viewed in the light most favorable to Plaintiff, a reasonable jury could find that the investigation into Plaintiff's misconduct was unfair and contained procedural irregularities when compared with the investigation into G.L.'s misconduct.  According to Defendant, Plaintiff was terminated for a substantiated claim of abusing a resident, which was based in large part on Mapes' statement to investigators, which they determined conflicted with Plaintiff's statement that she did not abuse him and which they determined "substantiated" the abuse claim.  But the resident's statements to investigators in G.L.'s case also conflicted with G.L.'s description of what happened.  And the resident was apparently upset enough that Defendant decided that G.L. would no longer attend to that resident.  Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendant gave more deference to G.L.'s version of events during his investigation into a more serious abuse violation than it did to Plaintiff's version of events during her investigation.

---

[77] *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 539 (10th Cir. 2014) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

A reasonable jury could also find that the investigation into Plaintiff's misconduct was unfair and contained procedural irregularities when compared with Defendant's treatment of Shockey. Shockey, unlike Plaintiff, admitted to using profanity in front of residents, which constitutes a violation of the Abuse, Neglect, and Exploitation Policy. While a reasonable jury could find that using profanity is not comparably serious as handling a patient roughly, it is an admitted violation of the same policy, for which Shockey was not terminated. Indeed, Root-Covel told Officer Davis that Plaintiff had previously been disciplined for using profanity when she was asked about whether Plaintiff had prior reports of abuse. A reasonable jury could decide that Defendant was more lenient with Shockey by declining to terminate her despite an admitted violation of the policy.

Finally, a reasonable jury could find that the investigation into Plaintiff's misconduct was unfair and contained procedural irregularities when compared with Defendant's treatment of Corn and Wilson. Like Plaintiff, they were suspended pending an investigation into a violation of the Abuse, Neglect, and Exploitation Policy, but the investigators decided that the resident's allegations were unsubstantiated. As with G.L., a reasonable jury could conclude that this was preferential treatment given the lack of information in the record to explain why the investigators credited Corn and Wilson's version of events over the resident's.

### ii.     Other Pretext Evidence

Defendant wholly fails to address Plaintiff's other pretext arguments, suggesting that the Diversion Agreement negates Plaintiff's claims of pretext. As described above, the stipulation of facts in the Diversion Agreement does not prohibit Plaintiff from arguing that the stated reason for the termination decision, made one year before, was a pretext for discrimination. The Court must consider Plaintiff's unanswered summary judgment arguments that the investigation was

unfair and that there were procedural irregularities.  The "'failure to conduct what appeared to be a fair investigation of' the violation that purportedly prompted adverse action may support an inference of pretext."[78]  Also, Plaintiff may be able to raise an inference of pretext if she can show "disturbing procedural irregularities" surrounding the investigation and disciplinary decision,[79] which usually take the form of deviations from internal company policy.[80]  "Moreover, 'the standard for establishing pretext requires evidence of not just any procedural shortfall, but of a *disturbing* procedural irregularity, often exemplified by an employer's falsifying or manipulating of relevant criteria.'"[81]

Plaintiff argues that the investigation into her conduct with Mapes was unfair, which demonstrates that the termination decision was a pretext for discrimination.  She claims that Root-Covel placed too much emphasis on the statement of new-employee Perkins, failed to give enough credit to Plaintiff's version of events, and failed to take a statement from the charge nurse, in contravention of Defendant's policies.  Plaintiff also offers evidence that Root-Covel and Ricketts interfered in Officer Davis's interview of Mapes, and that Mapes did not "substantiate" the abuse because he did not name Plaintiff or clearly remember what happened during his interview.  Finally, Plaintiff claims that Root-Covel tainted the investigation by telling Officer Davis that Plaintiff was previously suspended for using profanity around the residents, and that Root-Covel exaggerated the evidence in her KDADS report.  The Court agrees that a reasonable jury could find that this evidence, in combination with Plaintiff's evidence that

---

[78] *Smothers*, 740 F.3d at 542 (quoting *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1160 (10th Cir. 2008)); *Dewitt v. S.W. Bell Tel. Co.*, 845 F.3d 1299, 1314 (10th Cir. 2017).

[79] *See Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1122 (10th Cir. 2007).

[80] *See, e.g.*, *Hysten v. Burlington N. Santa Fe Ry. Co.*, 415 F. App'x 897, 909 (10th Cir. 2011).

[81] *Hysten.*, 415 F. App'x at 909–10 (quoting *Cooper v. Wal-Mart Stores, Inc.*, 296 F. App'x 686, 696 (10th Cir. 2008)) (internal quotation marks omitted).

similarly situated white employees were investigated with greater deference despite comparable violations, demonstrates that Defendant "didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda."[82]  Summary judgment is therefore denied on Plaintiff's discrimination claims.

### B.    Retaliation

Plaintiff alleges retaliation because she complained about race discrimination in December 2020.  She alleges two separate materially adverse employment actions in the Pretrial Order: (1) her termination, and (2) Defendant's interference in law enforcement's investigation—coercing a negative statement from Mapes and otherwise making false and misleading statements to Officer Davis.[83]  At times, Defendant conflates these claims in its motion for summary judgment.  The Court is careful to consider both retaliation claims separately below.

### 1.    Prima Facie Case

The elements of a prima facie claim of retaliation under Title VII or § 1981 are: (1) the employee engaged in protected opposition to discrimination; (2) the employee suffered an adverse employment action during or after his protected opposition that a reasonable employee would have found materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action.[84]  Although Defendant does not appear to dispute that Plaintiff engaged in protected activity or that she was subject to materially adverse actions, it argues there is no causal connection between Plaintiff's protected activity and the adverse employment actions.

---

[82] *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1211 (10th Cir. 2010).

[83] Doc. 44 at 7 ¶ 4.ii–iii.

[84] *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011).

A causal connection exists between the protected activity and the materially adverse action where retaliatory animus was a "but-for" cause of the adverse action.[85]  "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."[86]  In the Tenth Circuit, where "protected activity is closely followed by an adverse employment action" it is sufficient evidence of causation.[87]  However, "where a considerable length of time has elapsed between a protected activity and an adverse employment action, a plaintiff wishing to survive summary judgment must 'present "additional evidence" tying the adverse employment actions to [the plaintiff's protected activity].'"[88]

Although close temporal proximity does not require a specific amount of time, the Tenth Circuit has explained the requirement for purposes of the prima facie case as follows:

> It appears clear that, if the adverse action occurs in a brief period up to one and a half months after the protected activity, temporal proximity alone will be sufficient to establish the requisite causal inference; but it is equally patent that if the adverse action occurs three months out and beyond from the protected activity, then the action's timing alone will not be sufficient to establish the causation element.  However, where along the temporal line beyond one and one-half months but short of three months, the adverse action's timing ceases to be sufficient, standing alone, to establish the requisite causal inference is less than pellucid. [89]

Here, Plaintiff complained about discrimination by her coworkers on December 25, 2020, at the earliest.  Officer Davis's investigation happened on February 5, 2021, and Plaintiff was

---

[85] *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 516 (10th Cir. 2015); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 359–60 (2013).

[86] *Nasser*, 570 U.S. at 360.

[87] *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1191  (10th Cir. 2016) ("*Nassar* has not altered the burden a plaintiff bears in supporting the causation element of a prima facie case of ADA retaliation.").

[88] *Id.* (alteration in original) (quoting *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014)).

[89] *Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013) (citations omitted).

terminated on February 9, 2021.  Both alleged adverse employment actions were within one and one-half months of the protected activity, so the Court finds that Plaintiff has fulfilled her non-onerous burden of production that her complaint was the but-for cause of the adverse employment actions.

### 2.    Defendant's Legitimate, Non-Retaliatory Reason for Termination

Defendant contends that Plaintiff was terminated for a substantiated allegation of abuse of a resident on February 4, 2021, after it conducted an investigation into her conduct. Defendant has therefore met its minimal burden of articulating a legitimate, non-retaliatory reason for Plaintiff's termination.

As for Defendant's conduct during the criminal investigation of the abuse allegations, Defendant denies that it provided false or misleading information to law enforcement and denies that it coerced Mapes' statement.  This fulfills Defendant's burden of articulating a legitimate, non-retaliatory reason for its conduct during the investigation.

The burden therefore shifts back to Plaintiff to show that these non-retaliatory reasons for her termination and Defendant's conduct during the investigation are a pretext for retaliation.

### 3.    Pretext

Unlike the causation element of the prima facie case, "temporal proximity alone is insufficient to raise a genuine issue of material fact concerning pretext" on Plaintiff's retaliation claims.[90]  There must be other evidence of pretext.[91]  In addition to temporal proximity, Plaintiff incorporates by reference her pretext arguments on the discrimination claim and argues that the

---

[90] *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 976 (10th Cir. 2017) (quoting *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1213 (10th Cir. 2007)).

[91] *Id.*

lack of documentation that her complaint of discrimination was investigated suggests the reasons given for Defendant's conduct were pretext for retaliation.

Again, Defendant relies almost exclusively on the charges filed against Plaintiff, the stipulation of facts in her Diversion Agreement, and its motion to strike in arguing that Plaintiff fails to demonstrate that her protected activity was the "but-for" cause of her termination and the criminal charges.  As stated above, the Diversion Agreement standing alone does not establish that Defendant's non-retaliatory reasons for the adverse employment actions are entitled to credence.  Plaintiff signed the Diversion Agreement more than one year after the adverse employment actions occurred.  Moreover, Defendant fails to address Plaintiff's other arguments in support of pretext on these retaliation claims.  For substantially the same reasons explained on the discrimination claims, the Court finds that Plaintiff has submitted sufficient evidence upon which a reasonable jury could conclude that Defendant's non-retaliatory reasons for the adverse employment actions are unworthy of credence.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Medicalodges, Inc.'s Motion for Summary Judgment (Doc. 45) and Motion to Strike Plaintiff['s] Declaration in Support of her Memorandum in Opposition to Defendant's Motion for Summary Judgment Against Plaintiff (Doc. 54) are **denied**.  The Court will be in contact with the parties to set this matter for a Final Pretrial Conference.


**IT IS SO ORDERED.**

Dated: January 25, 2023

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE
